Good morning, and may it please the Court, I'm Bob Wright, and I'm representing the Plaintiff Appellant's Center for Biological Diversity, Restore the Delta, and the Planning and Conservation League this morning. And my co-counsel, Adam Keats, is here with me at the counsel table. I want to start with the conclusion that I want to support this morning, and I would like to reserve at least five minutes for rebuttal, Your Honor. And what this case is about is here today, and what I'm going to talk about is statutory interpretation. It's the position of the government that the Congress, when it enacted the Water Infrastructure for the Nation Improvement Acts back in 2016, eliminated what would otherwise be standard review at least some level under the Endangered Species Act, the ESA, and the National Environmental Policy Act, NEPA, of creating contracts or renewing contracts, issuing contracts, that in this case could be permanent contracts, in a situation in which there are imperiled, endangered, enlisted fish species that, of course, may be affected by withdrawing potentially forever huge quantities of freshwater from them and their designated critical habitat. Also clearly what would normally be a major federal action under the National Environmental Act, under NEPA. And so what my conclusion would be, Your Honors, is if it was Congress's intent to take away that standard review, at least of some level, under the ESA and NEPA, it would not have included in the language in Section of the WIN Act 4011A1, which requires conversion of the water service contracts upon request into the repayment contracts. It would not have included the language, it must be under mutually agreeable terms and conditions. Because once you have- Well, can I jump to the chase? The WIN Act seems to want to incentivize the conversion of water service contracts into these prepayment or repayment contracts. Yes. Would you agree? Because it says shall. At the request, the Secretary shall do this. And as you point out, there's the mutually agreeable terms. But then we have that, I think, the key provision that the parties are disputing under C, that all contracts entered into these conversion contracts shall not modify other water service repayment exchange and transfer contractual rights between the Water Users Association and the Bureau. How should we interpret that? Because that, you know, I read Houston, and I know you rely principally on our case in Houston, but the Reclamation Act under Houston did not have this additional provision. So what do we make of this provision? And that's what I'm going to talk about next, Robert, but thank you very much for your question. Well, there's not a lot of time, so I wanted to get you to that point. So I need to digress to something else. I wanted to talk to you about the entire section of the WIN Act, 4011A4C. And if we look at it, the initial language is all contracts entered into pursuant to paragraphs 1, 2, and 3A shall not be adjusted on the basis of the type of prepayment financing. So we know that that language pertains to the contracts that are being converted. Crystal clear. B says that the contracts shall conform to any other agreements, such as applicable settlement agreements. Okay, that's real clear. And then we get to C, which Your Honor basically quoted, not modify other, and it goes through the contracts and so forth. But it uses very different language than under Section A. If Congress had intended that language to apply also in addition to other contracts and rights under state law, it's reasonable that Congress would have had language like it did in subsection A, which would make it crystal clear that the language didn't just apply to other contracts and rights under state law, but it would also apply to the actual contracts being converted. So I understand your argument to be that this is meant to apply to other water contracts, but C doesn't say other contracts. It says not modify other water service contractual rights. And so it's not talking about other contracts, it's talking about contractual rights within this subject of conversion. So I think, you know, I thought the district court made a good point. How could this, how could a contract here modify completely separate contracts? Well, thank you, Your Honor, because you'll see that after water service and repayment, it says exchange. There are no exchange contracts that were converted. The only contracts that were converted were the water service contracts. Exchange contracts are different contracts. They're all listed, the types of contracts, at our appendix, page 825. The district court listed them at one excerpts of record, page 30. The exchange contractors, Your Honor, that was back in the day, those were folks who had riparian rights along the San Joaquin River. They gave up those rights in return to get Central Valley Project contracts. Those are totally separate contracts. So we have two things, at least in Section C, that have nothing to do with the contracts that could be converted. So, I mean, that might suggest that 4C is also applying to other contracts, but why does it not also mean that it's not applying to these contracts, to say that this change from a service contract into a repayment contract shall not affect any other rights, whether in these contracts or any other contracts? Yes, and that, of course, is the argument that the Bureau of Reclamation makes. And, you know, if I was drafting it, I would use the word contracts instead of the contract rights to foreclose that argument. But then I would go back to what I said at the beginning, Your Honor, in Section 4011A1, they said under mutually agreeable terms and conditions. And I would think we would expect that the Congress, with their expertise and all that they have, and when they are able to pass a law to get it done right, again, they just would not have included that language because, given what Your Honor just said, now you've created a total conflict. In the first part of 4011, you said it's under mutually agreeable terms and conditions. And then under Reclamation's interpretation, there can't be any mutual agreeable negotiated  I think they would say the agreeable terms and conditions relate to this particular restructuring of the contract in the way that the Act contemplates, not about other rights associated with the water that would be separate from that. So I don't know that their reading really creates a conflict. It may be yours that invites that. Well, I would say that they would have added the word financial and said mutually agreeable financial terms and conditions. And from the cases I think we cited in the briefs, the courts, Your Honor, I would urge don't add language to what Congress has enacted. And that mutually agreeable language is similar to the language that this Court, when it decided the Houston case and reiterated in the NRDC v. Halen case a couple years ago, that that means discretion. Mr. Wright, let me ask you this. I took some significance from this and you might not, and so I would be curious to hear what your explanation is. The Reclamation Act already has a conversion provision in it as well, correct? I believe it goes way back, Your Honor, yes. So the Reclamation Act allows for these renewal of water service contracts, but it also allows for conversion of contracts. What the Winn Act did was this new mechanism to allow for prepayment. I think that was a bit of the change in the Winn Act. But the old Reclamation Act conversion language talks about the same under mutually agreeable terms and conditions. If Congress wanted to allow that flexibility, it could have just adopted that same language from the Reclamation Act, but it went along and added this additional provision of shall not modify. Doesn't that suggest that Congress was intending to do something a little bit different, maybe to supercharge or really incentivize these water rights holders to convert and prepay and, through those funds, create more water storage? Do you take the same significance in it that I do or something else? Well, with all respect, Your Honor, I don't, and because I think the Congress is well aware of what the courts have held, including the Supreme Court, that repeals by implication are not favored and that Congress will specifically address language if it's going to change the rules, so to speak. And of course, they did that eight times in the Winn Act, including four times with respect to tribal settlement agreements, and they expressly referenced NEPA. So Congress did that, and again, I need to stop repeating, that just respecting Congress that they wouldn't, let's say that language does apply to these contracts as well, would not create that kind of conflict. They would make it so easy and just say, no ESA or NEPA review is required in converting these contracts. And instead, they include the savings language, Your Honor, like in 4012A2, that, pretty strong, this subtitle shall not be interpreted or implemented in a manner that affects or modifies any obligation under the CVPIA, which means the Central Valley Project Improvement Act, except for the savings provisions of the Stanislaus River Predator Management Program. I just don't think Congress would act in such a way as to maximize the arguments that people like the plaintiff's appellants I'm representing would have to require ESA and NEPA review if it was their intent to eliminate it. Well, I mean, to be fair, I think Reclamation would argue that the WIN Act is more than just these conversion. It has other provisions as well to try to streamline or incentivize more water storage. And, you know, this was passed during the time of California's drought. So it may very well be that the savings clause was meant to apply to these other aspects of the WIN Act, but Congress reserved this particular feature of the conversion for just a streamlined process. Here's my other question. It doesn't mean that there wouldn't be environmental review over the Central Valley Project because the CVPIA still requires environmental review over the overall operations of the project. It's just, I guess, Reclamation's argument is it's not triggering environmental review for particular conversions, even as there is overall environmental review. I intend to ask your friends on the other side that question, but isn't that the case? I mean, we're not eliminating environmental review from this overall process, just from this one feature of it, if we were to disagree with you. But we are eliminating, as you said, the feature of entering into these contracts, and that has been up to now. We're not seeking anything different, Your Honor. That's been required ever since the NRDC v. Houston case made it crystal clear. In fact, that was an intent of the Central Valley Project Improvement Act to get Reclamation to do environmental review and try and save these endangered enlisted fish species. But I would have more I would say on that because, Your Honor, in addition to the beginning, what Congress did in the two sections, including the mutual agreeable terms and conditions language and the argument I've made that A4C doesn't apply to the converted contracts, we have what Reclamation did after the fact. In Article 46 of the contracts, the converted contract state, that's where they say, this amended contract has been drafted, negotiated, and reviewed by the parties. That's a, I don't know if I need to be doing this, but that's at two excerpts of Record Volume 2 at page 224. And they go on to say, very specifically, Your Honor, that the double-spaced articles of this amended contract have been drafted, negotiated, and reviewed by the parties. The single-spaced articles are standard articles pursuant to Bureau of Reclamation policy. Now, I'm going to suggest, Your Honor, what's missing there. There's nothing in Article 46, nothing, that says these articles are here because we can't modify the terms and conditions of the prior contracts. Not a peep. So the argument that we're making to Your Honors is not only consistent, at least in our view, Your Honor, with what Congress said at the outset in 4011A1, but also consistent with what the Bureau of Reclamation did when it converted the contracts. And in the contracts itself, Your Honors brought up the point of what the district judge said. Why would they be worried about other contracts affecting them? Well, Article 26 of the converted contracts says, This contract shall not be construed as limiting or curtailing any rights which the contractor or any water user in the contractor's service area has under any other contract. And that language appears at Volume 2 of our excerpts of record at page 205. I would say also... Yeah, you would agree, though, that ultimately this case really does turn on a statutory interpretation. Like, what's the best way to read the provisions of the WIN Act? Your Honors, I believe, certainly are going to decide this case based on statutory interpretation. And that's why I came here to talk about the statutory interpretation. Although I do think it's relevant what the Bureau of Reclamation actually did. I would also say that the conclusion I've asserted is consistent with the law, like the Supreme Court in the Epic Systems Corporation case, where they say that Congress will... We disfavor repeals by implication and Congress will specifically address pre-existing law before suspending the law's normal operations in a later statute. And I would submit, Your Honors, that with all respect for our United States Congress, they certainly had the power to exempt creating these permanent contracts from both the Endangered Species Act and EPA. But they had the power to do that. That they would have said so. And they didn't say so at the Supreme Court and that the Ninth Circuit has also followed that case. They have said that Congress will say that specifically. We've taken you into your rebuttal time. I know you'd asked to try to reserve five minutes. And so do you want to reserve some time and we can put five minutes on the clock when you come back? I just want to say one more thing. And I've cut into my reserved time, Your Honor. But I also then have... Remember please that the prior contracts required Endangered Species Act and NEPA review. So under the Bureau's interpretation, you can't eliminate it. Let's say this language does apply in 4011A4C to the converted contracts. They can't take out, which is what they did in Articles 2 and 3E. They can't take out Endangered Species Act and NEPA review because they were both required by the prior contracts. Thank you very much, Your Honors. Thank you. I know we have appellees splitting time, so it looks like we're going to hear first from Ms. Ellis. Yes, that's right.  Good morning, and may it please the Court, Angela Ellis on behalf of the federal appellees. So I intend to use 14 minutes reserving six minutes for the contractor appellees. Your Honors, when Congress enacted the WIN Act in 2016, it required reclamation to take specific action to convert the financial repayment terms of water service contracts upon request. I think all parties agree that Congress imposed a mandatory duty on reclamation when it did that. If a water contractor requests conversion, reclamation must convert the contract. It has no other option. And in Paragraph 4 of Section 4011 of the WIN Act, Congress also prohibited reclamation from modifying other contractual rights. And so the District Court rightly concluded that the WIN Act just simply makes it impossible for the agency to exercise discretion for listed species in this process of converting contracts. Now, my friends on the other side suggest that this somehow allowed reclamation to evade environmental review, and that's not right, and I do want to be very clear. This is not a case about reclamation trying to skirt its obligations under NEPA or the ESA. It is true that both statutes require, at the threshold, discretion. And although reclamation lacked the discretion to benefit species here when it converted the contracts, reclamation undertakes extensive environmental review of its long-term operations of the Central Valley Project, and that review includes analyzing the environmental effects of implementing these contracts. And in fact, this court— So that's a separate, ongoing review? That is a separate, ongoing review. The agencies completed this Programmatic Environmental Impact Statement and Biological Opinions most recently in 2024, and adopted a Record of Decision in 2025. But yes, that is an ongoing, periodic, programmatic review that really covers how the water is delivered in this system. So can I ask that—I read somewhere that there have been 67 contracts converted since from 2020 to 2021. Did the overall environmental review dig into these contract conversions as part of its review process? Yes. I think that the programmatic documents do take into account the contracts, and if you look at the 2025 Record of Decision, there are parts of that that discuss implementing the contracts. And so, yes, the project overall, when reclamation looks at and studies its operations overall, it is looking at how it implements the projects, what the effects are, and in addition— Including the environmental impacts of converting a contract from water services to a repayment contract? I don't know that it's looking at the—no. I don't know that it's looking at the specific impact of that conversion process, but it is looking at the implementation of the contracts as they exist. And so— But is the reason for the former point that it has no—in reclamation's view in conducting a programmatic review, this change in essentially the structuring of the contract would not have any kind of environmental effect? Well, I think that reclamation determined rightly that—because it converted the contracts and it didn't alter any other existing rights. And so, the contract conversion itself did not alter the amount of water to be delivered or the timing or any of those other provisions. So, that may well be true, but I don't think that's why reclamation didn't engage in a contract-specific review here. I'm curious about the rationale for Congress omitting NEPA or ESA review of the conversion. And maybe you're partially answering that right now by saying there was no—there's no conceivable environmental impact from a conversion versus, I guess, a renewal. Mm-hmm. Is that what you're—is that the rationale for Congress's acting in this way? I think Congress's rationale was that it really wanted to incentivize water service contractors to convert their contracts. Congress wanted the prepayment to take place to fund water storage projects and wanted that to happen and wasn't suggesting that reclamation could either choose not to do that because they had concerns about impacts to species and not suggesting it would or should, right? But they— Why—what's the rationale for Congress wanting to incentivize the conversion of these contracts and the prepayment of it? Well, as the district court found, by allowing prepayment, Congress intended the water service contractors to come and prepay their debts on a sooner basis than they would otherwise have done on the preexisting contracts. And they were going to use that additional money to help to fund water storage projects, which were an important need in the project. And what did the contractors get out of the prepayment? Well, in some ways, I think it was turning—I think of a water service contract as something akin to a lease or a lease to own, and this allowed them to pay down the capital, sort of converting it into something that's more like a mortgage. So they—and Congress offered it on favorable terms. I think a favorable treasury rate allowed them to do it more quickly than they otherwise would have been able to do. As Judge Sanchez recognized, contract conversion was a right that they already had, but the WIN Act incentivized it in allowing prepayment and doing so on favorable terms. So what about plaintiff's argument that 4C is referencing other water contracts as opposed to the conversion contracts? Why do you disagree with that? I don't think it's a plausible reading of 4C's text. As the district court noted, it references contractual rights, not simply contracts. And I think whether it could or couldn't, as a matter of sort of contract law, apply to other contracts, there's nothing in this text that suggests it doesn't apply here. And I think Congress did that for a reason, right? Congress is legislating against the background of the law here, and Congress is saying, hey, Reclamation, we want you to convert these contracts, and we don't want you. We want the contractors to want this and do this, and we don't. And so you cannot, in this process, go and sort of change other contractual rights that are underlying. I mean, I think plaintiffs make a good point that we disfavor repeals by implication. And if conversions under the Reclamation Act was subject to environmental reviews, this is a pretty roundabout way to get to a very important issue of no environmental review for this type of conversion. Why should we read it along those lines? To counsel's point, why didn't Congress speak more directly to that issue? I think Congress did speak fairly directly to that issue. You know, Congress knows the difference between the words may and shall, and it chose shall, and Congress took the trouble to do that. But shall was in before as well. I think shall was into the Reclamation Acts, wasn't it, I think? I think, yes, and in Houston, there is a shall as well, but of course, not to take us off track, but the grant in Houston was, I think, broader. And so I guess I want to make two points. I don't think we're in a world where we need to worry about repeals by implication, because both NEPA and the ESA require, at the threshold, a determination of whether an agency has discretion. So that is just how those statutes ordinarily apply. And for that reason, we have the cases in Houston, and then later in Jewell, those cases turn on the question of discretion. So it's not as if there's some preexisting law that says contracts require ESA review, right? This just comes from the fact that when an agency takes a discretionary act, it has an obligation to study the environmental effects of that act under NEPA and under the ESA. But it's just a fundamental feature of both statutes, that if Congress tells an agency to go do something, and it's non-discretionary, then it just has to carry that out. And I think it really makes sense, I mean, if you think of the purpose of NEPA. The core purpose of NEPA is to inform agency decision-making. And so when there's no discretionary decision to be made, there's just no purpose for NEPA to inform. And I think this Court's precedents recognize something similar with the ESA. If Congress is requiring you to move forward and do something, then there's not a purpose that can be served by the consultation process. So what are, give me an example of a mutually agreeable term that might be negotiated despite 4C that wouldn't affect existing water contractual rights? Well, I assume that there are plenty of sort of details to be made about how one would convert the contract to allow for prepayment. So I assume there are specific financial requirements in there, how prepayment is to be made, financing obligations, things like that, that would be negotiated over. And I assume that was necessary, and that's why Congress did say that Reclamation had to convert the contracts to allow for prepayment of a repayment contract under mutually agreeable terms and conditions, anticipating that there would need to be a back and forth over the specifics of the prepayment. How about the savings clauses? Can you walk through those and why they don't change anything here in your view? Sure. Yes. So the plaintiffs cite section 4012A2 of the WIN Act, which says that it shall not be interpreted or implemented in a manner that affects or modifies any obligation under the CBPIA. And the CBPIA just did not contemplate the WIN Act contract conversions. So the CBPIA did contemplate that Reclamation would undertake environmental review when it's renewing, but not that it would undertake this review for contract conversions because the WIN Act hadn't been passed yet, and conversion and renewal are just two different things. Similarly, the savings clauses that say that the WIN Act shouldn't be interpreted to override, modify or amend the applicability of the ESA, that goes back to the point I was making just a couple of minutes ago, which is to say that the ESA just already doesn't apply to nondiscretionary acts. And so there's no modifying or amending or overriding of the ESA here. It's just a straightforward application of the ESA given the statutory interpretation of the WIN Act. And what about counsel's arguments that Reclamation's actions are inconsistent with the theories that you're proposing here? Your Honor, I was referring to some of the conforming edits that Reclamation made in the contracts. So the plaintiffs are pointing to Article 3E of the prior contracts, which said that the contractors had to comply with applicable biological opinions. And it is true that Reclamation made what I think quite clearly are conforming edits to avoid internal inconsistency. And the problem with plaintiffs' reading is that it is reading into this contract provision a substantive obligation to undertake environmental review that is just not there. And I think that my friends on the other side are proposing something, an interpretation of language that really is foreclosed by Holland. Holland construed very nearly identical language and noted that this language applied only to the contractor. So by its terms, it applies to the contractor and it gives no authority to Reclamation. Holland also found that it did not apply to any consultation other than the one that applied to that contract as executed. So in your view, the prior contracts before conversion do not have a built-in requirement of environmental review? No, that's right. This term merely says that the contractor is obligated to abide by terms and conditions that are imposed by a biological opinion. It's not some substantive obligation that Reclamation has to undertake a new review. And so by omitting that language in the converted contracts, Reclamation was merely maintaining that status quo that the contractor must continue to abide by those terms and conditions. I mean, I suppose there doesn't need to be a contractual provision because Reclamation does have an independent legal obligation to do those environmental reviews.  That's true. And indeed, in its programmatic documents, Reclamation has the ability to, the services can recommend mitigation measures, right, reasonably prudent alternatives that make sure that the implementation of these contracts is done in a way that doesn't cause any jeopardy to species or critical habitat. Last question from me. In the overall programmatic environmental review process, if Reclamation were to determine that the total flow of water is actually creating environmental harms to certain species, to pull back the overall water to water holders despite the conversions that have taken place? Yes. Yes. And in fact, it routinely does that. So there is a shortage provision in the contracts that makes very clear that the amount of water any contractor will receive in any given year is uncertain and subject to these hydrologic conditions. And indeed, those programmatic documents do say they have provisions that ensure that if you are in a drought year, they're going to pull back the amount of water that's delivered. And in fact, my understanding, although this is not in the record, is that in this year, the water contractors have been receiving only 20 to now maybe 25 percent of the water that's contracted for. That's something that's about water availability. I'm talking about environmental impacts from the water. Is that something that Reclamation believes can happen under its programmatic environmental review? I think the answer to that is correct if I'm if I'm understanding your honor correctly, that the amount of water provided and the triggers for that are environmental impacts so that they can make sure that they're taking steps that they need to take for species as provided. I think I understood. Yes. OK. Miss Ellis, thank you. It looks like we'll now hear from the Sacramento Municipal Utility District. Miss Nickel. Good morning. May it please the court. My name is Meredith Nickel and I represent SMUD, but also many other water entities who have contracted with the Bureau of Reclamation to purchase water, to irrigate farms, to deliver water to cities, to provide drinking water throughout the California Central Valley. Water obtained by these entities has been relied upon these urban and agricultural communities for over 50 years. When these entities first entered into contracts with Reclamation to purchase water, they did so under a provision of reclamation law that operates very much like the lease that Miss Ellis referred to. The lease was for a defined period of time at a price set to cover the cost of construction as well as the cost to deliver water. Those contracts, as Judge Sanchez pointed out, already were including a provision under reclamation law that allowed for this conversion from one type of contract to another type of contract. These contracts also complied with new environmental laws as they were enacted over the years. Including the ESA, NEPA, CVPIA. In fact, in 2024, this court already held that the contract specific consultation related to these contracts occurred and was upheld by this court in NRDC versus Howland. It was what the court referred to as the first track. So the existing contracts already had undergone that level of environmental review. Reclamation's overall operation, as the court has already noted, is also subject to overall project operations that includes review of the delivery activity of these contracts. And nothing about this case changes any of that. That all still exists. So what did change? In 2016, Congress enacted a law allowing these contractors to enter into a process whereby they were allowed to prepay under favorable financial terms to contribute to the storage project fund for reclamation. When they did that, these prepayment terms were set by Congress, but only within what Congress called mutually agreeable. I think it's important to look to the language of WINAC Section A-1, where what was mutually agreeable was the allowable prepayment terms. So what are those? I mean, it sounds like you have experience doing this kind of thing, or you're a contractor, you represent them. So what does that actually mean? So it means when you're looking at a financing structure, right, the terms of the contract don't specify the time or the mechanism by which that financing needs to occur. It just says you're going to prepay all of the construction, all of the capital costs. But what do those actual financial tools look like and how are they implemented? Those are the types of details that were subject to this mutually agreeable. That was the only thing that Congress allowed reclamation to negotiate, if you will, with the contractors. Now, are you talking about the interest rate to be paid and the amount of payments and the periodic payment terms specifically? Precisely. Yeah, there were certain such terms. As Ms. Ellis pointed out, there was a favorable discounted rate that was offered by statute. But all of the terms related to the specific interest rate, the time in which the contractor would prepay those costs, were all the things that were, you know, to be mutually agreed to under Section A-1. When read in that context, I think it makes the language of 4C much easier to understand because what it was saying is, although the certain terms of prepayment are the kinds of things that need to be negotiated between the contractor and reclamation in connection with this conversion, all of the other contract rights, the very important terms related to the amount of water that would be delivered, the conditions under which a shortage could be found, were not to be changed at all. Can I ask, explain 4A to me, then, that says all contracts entered shall, 4A says, not be adjusted on the basis of the type of prepayment financing used by the Water Users Association. What does that mean? So that means the underlying revenue generating scheme. So these water districts, there's a variety of different water districts. There's public irrigation districts, there are mutual water companies. All of those exist under specific provisions of California law that allow them to utilize different authorities to generate revenue. Those authorities also control what kinds of borrowing mechanisms each contractor can undertake. And so I read that language to mean that this conversion wasn't to require an individual contractor to generate revenue through, say, imposing a property tax versus a bond, or increasing water rates versus some other type of funding mechanism. So I read it to say that. So you don't read it the way plaintiffs do, where 4A refers to conversion contracts and then 4C to different ones, not non-conversion related contracts? No, I read 4 to apply to all such contracts. And so the WIN Act was designed to apply to different types of existing contracts. So water service contracts are the ones that are at issue today. There are other types. Mr. Wright was explaining the history of exchange contracts. There's also settlement contracts, which are slightly different. And I read 4 to apply to any such contract that is converted. These are the constraints under which that conversion must occur. Unless there's any other questions from the court, I'd like to turn it over to my colleague, Ms. Larson. Good morning. I represent Westlands Water District. My name is Cynthia Larson. I would just like to make a couple of additional points. And that is that should your honors determine that the district court's decision needs to be reversed. We have also put forward in Appley, Contractor Appley's answering brief alternative grounds upon which the decision of the district court should be upheld. The first one has to do with the WIN Act contract convergence did not change the status quo of CVP operations. And thus, they are not major federal actions requiring environmental review under NEPA, even if there is some degree of discretion. The second alternative ground has to do with the ESA because the WIN Act did not change the status quo of CVP operations. The contract conversions did not constitute agency actions triggering ESA, even if there was some degree of discretion. Finally, an additional ground for affirmance of the no NEPA trigger holding of the district court is that because the contract conversions are excluded under categorical exclusions of the agencies, NEPA review is not required. And we've laid these out in our brief. I know our time is very, very short. So I wanted to make the court aware of that and indicate also that should the court believe that it needs to depart from the district court's decision, the court should remand the case. The case is not ripe for judgment. There's been no consideration given to the remedy that should be used if there is reversal. And I'd like to also point out, as the court thinks about that, that my client, for example, has already paid between $200 million and $210 million in connection with these conversion contracts for the conversions. Others have paid very significant amounts. And in addition to that, there is very significant reliance, of course, by water users on the existence and ongoing water availability of these contracts. So remand would be appropriate rather than entry of judgment. However, we believe strongly that the district court's decision should be affirmed in its entirety. Thank you. Thank you, Ms. Larson. Mr. Wright, we'll put four minutes on the clock for you. Yes. Well, I'd say, first off, the Congress was also very specific in the incentives it gave the contractors to convert the contracts. Huge incentive that they expressly provided was relieving them from the acreage limitations. Another huge incentive was, instead of having to have 25-year term contracts, these contracts had no term. They'd be permanent. Like at times in the briefs, we call them forever contracts. So Congress was very, very express. Congress was acting fairly here. And if they had really intended to not have ESA or NEPA review of these permanent contracts with a total, I think, of over 3 million, when you add them up, 3 million acre-feet of water, they would have said so. They would have been straightforward about it, Your Honors. The next thing I would say was, among the double-space articles that reclamation said were drafted, negotiated, and reviewed by the parties when they converted the contracts were Articles 2 and 3, where they eliminated ESA and NEPA review. They didn't say they were eliminating them because of Section 4011A-4C, or there was no mutually agreeable discretion there. They said they were negotiated. The final thing, I would say this in terms of remedies, should Your Honors rule in favor of our interpretation we've offered to you here, both in the briefs and today, is since the WIN Act expired, of course the contractors would be disappointed. But it's not like water would stop flowing. They have the provisions under the CVPIA where they can get those interim two-year contracts that they had been doing for years, over and over, until the WIN Act was enacted. And they could also seek renewal for a 25-year term. And of course, there would be ESA and NEPA review there. And so we do seek, Your Honors, as a remedy, we do seek that judgment in favor of the plaintiff's appellants and that these contracts be determined void because reclamation failed to proceed in the manner required by the Endangered Species Act, the National Environmental Policy Act, the Central Valley Project Improvement Act, when they converted these contracts with absolutely no ESA or NEPA review whatsoever. I would just conclude by thanking Your Honors and asking if you have any questions for me. It appears not. And so, Mr. Wright, I want to thank you. I want to thank counsel for appellees. This matter is submitted. That concludes our calendar for this morning and this week. The court thanks the staff of this courthouse for their service this week. And we are adjourned. All rise. This court, for this session, stands adjourned.
judges: WARDLAW, BRESS, SANCHEZ